1   **THOMPSON COBURN LLP**
    **HELEN B. KIM, CSB 138209**
2   hkim@thompsoncoburn.com
    **GEOFFREY L. WARNER, CSB 305647**
3   gwarner@thompsoncoburn.com
    **2029 Century Park East, 19th Floor**
4   **Los Angeles, California 90067**
    **Tel: 310.282.2500 / Fax: 310.282.2501**
5
    **LATHAM & WATKINS LLP**
6   **MATTHEW A. BRILL (*pro hac vice*)**
    matthew.brill@lw.com
7   **ANDREW D. PRINS (*pro hac vice*)**
    andrew.prins@lw.com
8   **555 Eleventh Street, NW, Suite 1000**
    **Washington, D.C. 20004-1304**
9   **Tel: 202.637. 2200**

10  Attorneys for Defendant CHARTER
    COMMUNICATIONS, INC. and
11  SPECTRUM MANAGEMENT
    HOLDING COMPANY, LLC
12

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15                    **EASTERN DIVISION**

16

17  STEVE GALLION                      CASE NO. 5:17-cv-01361-CAS-KK
    Individually and on behalf of all others
18  similarly situated,
                                        **CHARTER COMMUNICATIONS,**
19            Plaintiff,                **INC. AND SPECTRUM**
                                        **MANAGEMENT HOLDING**
20       vs.                           **COMPANY, LLC'S**
                                        **CONSOLIDATED REPLY**
21  CHARTER COMMUNICATIONS,             **MEMORANDUM OF POINTS AND**
    INC., and SPECTRUM                  **AUTHORITIES IN SUPPORT OF**
22  MANAGEMENT HOLDING                  **THEIR MOTION FOR JUDGMENT**
    COMPANY, LLC; DOES 1 through 10,    **ON THE PLEADINGS**
23  inclusive,
                                        Judge:    Hon. Christina A. Snyder
24            Defendants.               Date:     February 5, 2018
                                        Time:     10:00 a.m.
25                                      Ctrm:     8D

26

27

28
                                        Case No. 5:17-cv-01361-CAS-KK

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 1

I.  THE GOVERNMENT AND PLAINTIFF CANNOT SHIELD
    SECTION 227(b)(1)(A)(iii)'s CONTENT DISCRIMINATION
    FROM REVIEW .............................................................................................. 1

    A.  Circuit Law Does Not Preclude Spectrum's
        Constitutional Challenge ...................................................................... 1

    B.  The Standing And Severability Doctrines Do Not Apply ................... 3

    C.  The United States' Sovereign Immunity Is Not Relevant .................. 6

    D.  Spectrum May Challenge The Provision's Application to
        All Speech, Including Noncommercial Speech ................................. 11

    E.  The Hobbs Act Does Not Apply ........................................................ 12

II.  BECAUSE SECTION 227(b)(1)(A)(iii) RESTRICTS SPEECH
     IN A MANNER THAT IS CONTENT AND SPEAKER
     BASED, STRICT SCRUTINY APPLIES .................................................... 15

III. THE GOVERNMENT AND PLAINTIFF FAIL TO SHOW
     THAT THE PROVISION WITHSTANDS STRICT
     SCRUTINY ................................................................................................... 17

    A.  "Residential Privacy" And "Revenue Collection" Are
        Not "Compelling" Interests Justifying Content-Based
        Restrictions ......................................................................................... 19

    B.  The Government And Plaintiff Fail To Identify Evidence
        Demonstrating That The Content-Based Restriction
        Advances A Compelling Interest ....................................................... 21

    C.  The Government and Plaintiff Fail To Identify Evidence
        Demonstrating That The Provision's Content-Based
        Distinctions Are Narrowly Tailored .................................................. 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.    *The provision is not narrowly tailored because it privileges the most intrusive, commercial speech over core protected speech.* ...................................................... 24

2.    *The government and Plaintiff fail to advance any evidence that discredits Spectrum's "obvious" less restrictive alternatives.* ........................................................... 30

CONCLUSION ................................................................... 32

DEFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A.N.S.W.E.R. Coal. v. Kempthorne*,
  537 F. Supp. 2d 183 (D.D.C. 2008) ................................................................... 10

*Alden v. Maine*,
  527 U.S. 706 (1999) ......................................................................................... 7, 8

*Am. Ass'n of Political Consultants, Inc. v. Sessions*,
  No. 5:16-CV-252-D, 2017 WL 1025808 (E.D.N.C. Mar. 15, 2017)............. 4, 13

*Animal Legal Def. Fund v. Wasden*,
  No. 15-35960, --- F.3d ---, 2018 WL 280905 (9th Cir. Jan. 4, 2018)............... 23

*Ark. Writers' Project, Inc. v. Ragland*,
  481 U.S. 221 (1987) ......................................................................................... 3, 21

*Berger v. City of Seattle*,
  569 F.3d 1029 (9th Cir. 2009).....................................................................*passim*

*Bourgeois v. Peters*,
  387 F.3d 1303 (11th Cir. 2004)........................................................................... 23

*Brickman v. Facebook, Inc.*,
  230 F. Supp. 3d 1036 (N.D. Cal. 2017) .................................................... 3, 15, 16

*Brickman v. Facebook, Inc.*,
  No. 16-CV-00751-TEH, 2017 WL 1508719 (N.D. Cal. Apr. 27,
  2017)..................................................................................................................... 1, 2

*Brown v. Poway Unified Sch. Dist.*,
  4 Cal. 4th 820 (1993).............................................................................................. 7

*Cache Valley Elec. Co. v. Utah*,
  149 F.3d 1119 (10th Cir. 1998)............................................................................... 4

*Cahaly v. Larosa*,
  796 F.3d 399 (4th Cir. 2015)................................................................... 5, 30, 32

*Campbell-Ewald v. Gomez*,
  136 S. Ct. 663 (2016) .............................................................................................. 9

*Carey v. Brown*,
   447 U.S. 455 (1980) ..................................................................*passim*

*Chafin v. Chafin*,
   568 U.S. 165 (2013) ........................................................................ 3

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ...................................................................... 20

*Citizens for Free Speech, LLC v. Cnty. of Alameda*,
   194 F. Supp. 3d 968 (N.D. Cal. 2016) ............................................. 8

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ...................................................................... 12

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) ........................................................................ 1

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011) ......................................................... 11

*Desert Outdoor Advert. v. City of Moreno Valley*,
   103 F.3d 814 (9th Cir. 1996) .................................................... 18, 29

*Dex Media West, Inc. v. City of Seattle*,
   696 F.3d 952 (9th Cir. 2012) ......................................................... 31

*DISH Network Corp. v. FCC*,
   653 F.3d 771 (9th Cir. 2011) ......................................................... 17

*Edenfield v. Fane*,
   507 U.S. 761 (1993) ...................................................................... 17

*Edwards v. City of Coeur D'Alene*,
   262 F.3d 856 (9th Cir. 2001) .................................................... 29, 30

*In re Extradition of Lang*,
   905 F. Supp. 1385 (C.D. Cal. 1995) ................................................ 4

*Foti v. City of Menlo Park*,
   146 F.3d 629 (9th Cir. 1998) .................................................. 7, 8, 30

*Frisby v. Schultz*,
   487 U.S. 474 (1988) ...................................................................... 20

*Gomez v. Campbell-Ewald Co.*,
   768 F.3d 871 (9th Cir. 2014) ........................................................................ 2, 20

*Greenley v. Laborers' Int'l Union of N. Am.*,
   16-cv-03773-WMW, 2017 WL 4180159 (D. Minn. Sept. 19, 2017) .......... 15, 16

*Gresham v. Swanson*,
   866 F.3d 853 (8th Cir. 2017) .................................................................................. 4

*Hassert v. Navient Solutions, Inc.*,
   232 F. Supp. 3d 1049 (W.D. Wis. 2017) .............................................................. 29

*Heckler v. Mathews*,
   465 U.S. 728 (1984) ................................................................................................ 5

*Holt v. Facebook, Inc.*,
   240 F. Supp. 3d 1021 (N.D. Cal. 2017) .......................................................... 3, 15

*Holt v. Facebook, Inc.*,
   No. 16-CV-02266-JST (N.D. Cal. May 2, 2017), ECF No. 86 ........................ 1, 2

*Hopper v. City of Pasco*,
   241 F.3d 1067 (9th Cir. 2001) .............................................................................. 14

*Hoye v. City of Oakland*,
   653 F.3d 835 (9th Cir. 2011) .................................................................... 16, 19, 24

*Int'l Church of Foursquare Gospel v. City of San Leandro*,
   673 F.3d 1059 (9th Cir. 2011) .............................................................................. 21

*Italian Colors Rest. v. Becerra*,
   No. 15-15873, --- F.3d ---, 2018 WL 266332 (9th Cir. Jan. 3, 2018) ...... 7, 23, 27

*Khademi v. S. Orange Cnty. Cmty. Coll. Dist.*,
   194 F. Supp. 2d 1011 (C.D. Cal. 2002) ................................................................ 8

*Kirkeby v. Furness*,
   92 F.3d 655 (8th Cir. 1996) .................................................................................. 20

*Klaver Constr. Co., Inc. v. Kan. Dep't of Transp.*,
   211 F. Supp. 2d 1296 (D. Kan. 2002) ................................................................... 4

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009) .................................................................. 19, 22, 24, 31

v                                      Case No. 5:17-cv-01361-CAS-KK

*Lambert v. Seminole Cty. Sch. Bd.*,
   No. 6:15-CV-78-ORL-18DAB, 2016 WL 9453806 (M.D. Fla. Jan.
   21, 2016) ........................................................................................................ 8

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994) .................................................................................... 4

*Long Beach Area Peace Network v. City of Long Beach*,
   574 F.3d 1011 (9th Cir. 2009) ................................................................ 14

*Maldonado v. Morales*,
   556 F.3d 1037 (9th Cir. 2009) ........................................................ 3, 6, 21

*Mejia v. Time Warner Cable Inc.*,
   No. 1:15-CV-06445-JPO, 2017 WL 3278926 (S.D.N.Y. Aug. 1,
   2017) ..................................................................................... 3, 10, 15

*Miller v. Reed*,
   176 F.3d 1202 (9th Cir. 1999) ................................................................ 21

*Morales-Garcia v. Holder*,
   567 F.3d 1058 (9th Cir. 2009) .................................................................. 2

*Moser v. FCC*,
   46 F.3d 970 (9th Cir. 1995) ........................................................ 2, 14, 20

*Nader v. Brewer*,
   531 F.3d 1028 (9th Cir. 2008) ...................................................... 17, 24, 26

*Nat'l Advert. Co. v. City of Orange*,
   861 F.2d 246 (9th Cir. 1988) ....................................................... 17, 20, 29

*Orr v. Orr*,
   440 U.S. 268 (1979) .................................................................................... 3

*Patriotic Veterans, Inc. v. Zoeller*,
   845 F.3d 303 (7th Cir. 2017) ........................................................ 4, 15, 20

*Perry v. Los Angeles Police Dep't*,
   121 F.3d 1365 (9th Cir. 1997) ................................................................ 20

*Philip Morris USA v. Williams*,
   549 U.S. 346 (2007) .................................................................................. 14

DEFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE
PLEADINGS

*Police Dep't of Chi. v. Mosley*,
    408 U.S. 92 (1972) ...................................................................................... 5

*Rappa v. New Castle Cnty*,
    18 F.3d 1043 (3d Cir. 1994) ....................................................................... 5

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ..................................................................... 1, 11, 28

*Reno v. ACLU*,
    521 U.S. 844 (1997) ................................................................................... 16

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) ............................................................................. 25, 26

*Sable Communications of Cal., Inc. v. FCC*,
    492 U.S. 115 (1989) ................................................................................... 18

*Seitz v. City of Elgin*,
    719 F.3d 654 (7th Cir. 2013) ....................................................................... 9

*Sessions v. Morales-Santana*,
    137 S. Ct. 1678 (2017) ................................................................................. 3

*Shamblin v. Obama for Am.*,
    No. 8:13-CV-2428-T-33TBM, 2015 WL 1754628 (M.D. Fla. Apr.
    17, 2015) .................................................................................................... 29

*Simon & Schuster, Inc. v. Members of New York State Crime Victims*
    *Bd.*,
    502 U.S. 105 (1991) ................................................................................... 11

*Solantic, LLC v. City of Neptune Beach*,
    410 F.3d 1250 (11th Cir. 2005) .............................................................. 9, 11

*Sudomir v. McMahon*,
    767 F.2d 1456 (9th Cir. 1985) ................................................................... 21

*Tex. Monthly, Inc. v. Bullock*,
    489 U.S. 1 (1989) ........................................................................................ 3

*Thalheimer v. City of San Diego*,
    645 F.3d 1109 (9th Cir. 2011) ................................................................... 17

*U.S. v. Booker*,
    543 U.S. 220 (2005) ............................................................................ 5

*U.S. v. Playboy Entm't Grp.*,
    529 U.S. 803 (2000) ............................................................... 10, 17, 32

*U.S. West v. FCC*,
    182 F.3d 1224 (10th Cir. 1999) ........................................................ 23

*Valle Del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir. 2013) ........................................................... 30

*Van Bergen v. Minnesota*,
    59 F.3d 1541 (8th Cir. 1995) ............................................................. 4

*Van Nuys Publ'g Co. v. Thousand Oaks*,
    5 Cal. 3d 817 (1971) ....................................................................... 19

*Video Software Dealers Ass'n v. Schwarzenegger*,
    556 F.3d 950 (9th Cir. 2009) ...................................................... 17, 21

*Watters v. Otter*,
    986 F. Supp. 2d 1162 (D. Idaho 2013) .............................................. 8

*Williams-Yulee v. Fla. Bar*,
    135 S. Ct. 1656 (2015) ............................................................... 27, 28

*Wilson v. A.H. Belo Corp.*,
    87 F.3d 393 (9th Cir. 1996) ............................................................. 13

*www.RicardoPacheco.com v. City of Baldwin Park*,
    No. 2:16–cv–09167–CAS(GJSx), 2017 WL 2962772, at *6 (C.D.
    Cal. July 10, 2017) ........................................................................... 11

*Yellow Pages Photos, Inc. v. Ziplocal, LP*,
    795 F.3d 1255 (11th Cir. 2015) ......................................................... 3

## STATUTES

28 U.S.C. § 2342(1) ................................................................................ 12

28 U.S.C. § 2344 .................................................................................... 14

47 U.S.C. § 153(39) .................................................................................. 9

47 U.S.C. § 227(a)(1) ................................................................. 6

47 U.S.C. § 227(b)(1)(A)(iii).............................................*passim*

47 U.S.C. § 227(b)(2)(C) .......................................................... 14

47 U.S.C. § 402(a) ............................................................ 12, 13

Pub. L. No. 102-243, 105 Stat. 2394 (1991) ........................ 6, 26

Pub. L. No. 114-74, 129 Stat. 584 (2015) ............................... 2, 6

## RULES

Fed. R. Evid. 201(b)(2)........................................................... 18

## REGULATIONS

47 C.F.R. § 64.1200............................................................... 30

## OTHER AUTHORITIES

Letter from Senators Markey and Lee to FCC Chairman Pai (Aug. 4,
    2017), *available at* www.markey.senate.gov/imo/media/doc/2017-
    08-04-DebtCollector-RoboCalls%20.pdf...................................... 25, 28

CBO, Estimate of the Budgetary Effects of H.R. 1314, the Bipartisan
    Budget Act of 2015, *available at* https://www.cbo.gov/publication/
    50938 ....................................................................... 23

Department of Education, Portfolio by Loan Status (DL, FFEL, ED-
    Held FFEL, ED-Owned), *available at* https://studentaid.ed.gov/sa/
    about/data-center/student/portfolio ....................................... 25

H.R. Rep. No. 102-317 (1991) .................................................. 27

Letter from Consumer Financial Protection Bureau to FCC, Office of
    the Secretary (June 6, 2016), *available at*
    https://ecfsapi.fcc.gov/file/60002112663.pdf............................... 26

Letter from National Consumer Law Center, CG Docket No. 02-278
    (filed Mar. 28, 2016), *available at*
    https://ecfsapi.fcc.gov/file/60001561632.pdf............................... 23

Letter from NCHELP to Federal Trade Commission, Office of the
   Secretary, "Public Workshop: Debt Collection 2.0: Protecting
   Consumers as Technologies Change" (Apr. 7, 2011), *available at*
   https://www.ftc.gov/sites/default/files/documents
   /public_comments/ftc-workshop-debt-collection-2.0-protecting-
   consumers-technology-changes-project-no.p114802-
   00008%C2%A0/00008-58349.pdf ................................................................. 25

Office of the Comptroller of the Currency, Mortgage Metrics Report,
   Q3 2015 at 4, 9, 14, *available at*
   http://www.occ.treas.gov/publications/publications-by-type/other-
   publicationsreports/mortgage-metrics/mortgage-metrics-q3-
   2015.pdf .................................................................................................. 26

*Rules and Regulations Implementing the Telephone Consumer
   Protection Act of 1991*, CG Docket No. 02-278, Declaratory
   Ruling and Order, 30 FCC Rcd 7961 (rel. Jul. 10, 2015) ..................................... 6

*Rules and Regulations Implementing The Telephone Consumer
   Protection Act of 1991*, CC Docket No. 92-90, Report and Order, 7
   FCC Rcd 8752 (1992) ...................................................................... 30

*Rules and Regulations Implementing The Telephone Consumer
   Protection Act of 1991*, CG Docket No. 02-278, Report and Order,
   18 FCC Rcd 14014 (2003) ............................................................... 30

*Rules and Regulations Implementing the Telephone Consumer
   Protection Act of 1991*, CG Docket No. 02-278, Report and Order,
   31 FCC Rcd. 9074 (2016) ..................................................... 16, 28, 31

*Rules and Regulations Implementing the Telephone Consumer
   Protection Act of 1991*, CG Docket No. 02-278, Declaratory
   Ruling, 31 FCC Rcd 7394 (rel. Jul. 5, 2016) .............................. 2, 9, 10

The government and Plaintiff fail to justify Section 227(b)(1)(A)(iii)'s content-based speech restriction.  They spend most of their briefs arguing that the statute is both immune from review and content neutral.  Yet the government acknowledges (at 5 n.1) that over the past year, in the wake of the Supreme Court's clarification of the relevant principles in *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015), four district court judges have found that Section 227(b)(1)(A)(iii) is content-based and subject to strict scrutiny.  This Court likewise should conclude that the provision is subject to strict scrutiny—"the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

Section 227(b)(1)(A)(iii) cannot survive such exacting review, because it unconstitutionally discriminates against core protected speech without sufficient justification.  Indeed, two district judges in this Circuit have already certified the provision's constitutionality for interlocutory appellate review, acknowledging that although they found that the provision survives strict scrutiny, "other courts could have endorsed the opposite result" on this "'highly debatable question[]'" in light of "the high bar that strict scrutiny presents." *Brickman v. Facebook, Inc.*, No. 16-CV-00751-TEH, 2017 WL 1508719, at *3-4 (N.D. Cal. Apr. 27, 2017); *see also Holt v. Facebook, Inc.*, No. 16-CV-02266-JST (N.D. Cal. May 2, 2017), ECF No. 86 at 1.  Spectrum respectfully submits that binding Ninth Circuit law, which was neither briefed nor discussed in those prior cases, establishes that this provision cannot constitutionally be applied to impose liability on Spectrum here.

## ARGUMENT

## I.   THE GOVERNMENT AND PLAINTIFF CANNOT SHIELD SECTION 227(b)(1)(A)(iii)'s CONTENT DISCRIMINATION FROM REVIEW

### A.   Circuit Law Does Not Preclude Spectrum's Constitutional Challenge

In arguing that Spectrum is barred from challenging the constitutionality of Section 227(b)(1)(A)(iii), the government (at 4-5) and Plaintiff (at 8-10) point to cases in which the TCPA was upheld against First Amendment challenges.  But

1   most of those cases do not address (and predate the promulgation or clarification

2   of) the content-based preferences that Spectrum challenges, and thus have no

3   relevance here.   This is particularly true with respect to the assertion by the

4   government (at 5-8) and Plaintiff (at 9) that this Court is bound to conclude that

5   Section 227(b)(1)(A)(iii) is content-neutral under *Gomez v. Campbell-Ewald Co.*,

6   768 F.3d 871 (9th Cir. 2014) and *Moser v. FCC*, 46 F.3d 970 (9th Cir. 1995), cases

7   in which the content-based distinctions that Spectrum challenges here *were neither*

8   *raised nor adjudicated*.   In neither case did any party argue, as Spectrum does here,

9   that Section 227(b)(1)(A)(iii) is content-based because of its exemption of

10  messages (i) that promote collection of government-backed debts (Motion, ECF

11  No. 18 at 3-5); (ii) that concern FCC-favored topics (*id.* at 5-6); (iii) of

12  governmental entities (*id.* at 7-12).   Indeed, these issues could not have been raised

13  then, given that the government-backed debt exception[1] and FCC's speech

14  preferences[2] *had not yet been enacted or promulgated*, and it was also unclear

15  whether Section 227(b)(1)(A)(iii)'s text exempted government speakers.[3]

16  Accordingly, the Ninth Circuit did not address these issues, and these decisions are

17  not binding precedent here.   *See, e.g.*, *Morales-Garcia v. Hold*er, 567 F.3d 1058,

18  1064 (9th Cir. 2009) (where an issue is neither "raised [n]or discussed" in an

19  opinion, such "non-litigated issues are not precedential holdings binding future

20  decisions.").   Indeed, it was the *absence* of binding circuit precedent that prompted

21  two judges in the Northern District of California to certify the constitutionality of

22  227(b)(1)(A)(iii) for interlocutory appellate review, *Brickman*, 2017 WL 1508719,

23

24  [1]   The government-backed debt exception was enacted in November 2015.
25  Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301(a)(1)(B), 129 Stat. 584.

26  [2] These distinctions were promulgated in 2014 and 2015.  *See* Motion at 6 n.4-7.

27  [3] The FCC clarified the statutory definition of a "person" in July 2016.  *Rules and*
    *Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG
28  Docket No. 02-278, Declaratory Ruling, 31 FCC Rcd 7394, ¶ 10 (July 5, 2016).

at *3-4; *Holt*, No. 16-CV-02266-JST, ECF No. 86 at 1, after rejecting the government's arguments under *Moser* and *Campbell-Ewald* and holding that the current version of the provision is content-based and subject to strict scrutiny, *Brickman v. Facebook, Inc.*, 230 F. Supp. 3d 1036, 1045 (N.D. Cal. 2017); *Holt v. Facebook, Inc.*, 240 F. Supp. 3d 1021, 1032 (N.D. Cal. 2017).

## B.    The Standing And Severability Doctrines Do Not Apply

The government argues (at 8-9) that Spectrum "lacks standing" to challenge Section 227(b)(1)(A)(iii), because the exemption for calls promoting the collection of government-backed debts is "severable." The government is doubly mistaken.

The government's attempt to shoehorn severability into a standing inquiry "confuses [jurisdiction] with the merits," *Chafin v. Chafin*, 568 U.S. 165, 174 (2013), as severability is not a threshold obstacle to standing, but a question of remedy, *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 n.21 (2017). By definition, a defendant "almost always" faces an impending injury (an adverse judgment) that is redressable by defeating the "plaintiff's claim for relief." *Yellow Pages Photos, Inc. v. Ziplocal*, *LP*, 795 F.3d 1255, 1265 (11th Cir. 2015). Accordingly, the Supreme Court has expressly rejected the argument that the potential for severance of an unconstitutional provision divests the challenger of standing. *Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 7-8 (1989) (rejecting this argument because it would impermissibly "insulate underinclusive statutes from constitutional challenge"); *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 227 (1987); *Orr v. Orr*, 440 U.S. 268, 272 (1979); *see also Maldonado v. Morales*, 556 F.3d 1037, 1044 (9th Cir. 2009) ("We have long held that [parties] have standing to challenge exceptions as underinclusive [even] when the exception does not apply to [them]."). Not surprisingly, then, the only two courts to decide this standing question in the TCPA context squarely rejected the government's argument. *Mejia v. Time Warner Cable Inc.*, No. 1:15-CV-06445-JPO, 2017 WL 3278926, at *13 (S.D.N.Y. Aug. 1, 2017) ("To treat severability as an issue of

3

1    justiciability would risk insulating underinclusive statutes from constitutional

2    challenge….”); *Am. Ass'n of Political Consultants, Inc. v. Sessions*, No. 5:16-CV-

3    252-D, 2017 WL 1025808, at *2 (E.D.N.C. Mar. 15, 2017).

4         Nor is the government-backed debt collection exemption actually severable

5    on the merits. *First*, "severability" is not a concept that could even apply in this

6    posture, given that Spectrum is a *defendant* raising the First Amendment as a

7    defense to its potential liability. Spectrum is not a plaintiff in a declaratory

8    judgment action where the Court might "fix" the statute prospectively by excising

9    its constitutional infirmities. The government cites no authority holding that a

10   court can use severance to cure an invalid statute in order to *impose retrospective*

11   *liability* on a *defendant* under the newly rewritten statute. Indeed, doing so—when

12   Spectrum could not be held liable under the then-governing statute when it placed

13   the calls at issue—would raise serious retroactivity concerns. *See Landgraf v. USI*

14   *Film Prods.*, 511 U.S. 244, 265 (1994) (noting the "requirement that *Congress* first

15   make its intention clear" before applying a statute retroactively) (emphasis added).

16        The government's case law is therefore inapposite: *In re Extradition of*

17   *Lang*, 905 F. Supp. 1385 (C.D. Cal. 1995), and *Klaver Constr. Co., Inc. v. Kan.*

18   *Dep't of Transp.*, 211 F. Supp. 2d 1296 (D. Kan. 2002), for example, involved

19   *plaintiffs'* constitutional challenges, and also involved challenges to laws that *did*

20   *not injure* the plaintiffs (unlike here, where Spectrum has been injured). In *Cache*

21   *Valley Elec. Co. v. Utah*, 149 F.3d 1119 (10th Cir. 1998), the plaintiff "adduced no

22   evidence" that its preferred remedy "would result in any meaningful reduction in

23   the" harm it was experiencing. *Id*. at 1123. The same is true of *Patriotic Veterans,*

24   *Inc. v. Zoeller*, 845 F.3d 303, 305 (7th Cir. 2017), and *Van Bergen v. Minnesota*,

25   59 F.3d 1541, 1551 (8th Cir. 1995), where the challengers conceded that the

26   speech restrictions did not harm them by restricting their communications. Nor

27   does *Gresham v. Swanson*, 866 F.3d 853, 854 (8th Cir. 2017) undermine

28   Spectrum's position: there, the court indicated that the potential for severability did

*not* deprive the challenger of standing to potentially invalidate a statute.

*Second*, the government's approach—severing just the exemption, rather than the entire prohibition—would be contrary to the remedy consistently applied in constitutional litigation, which by default provides for "extension" of the right abridged rather than "nullification" of the special exception, absent a "clear[] express[ion]" of a congressional preference for nullification. *Heckler v. Mathews*, 465 U.S. 728, 739 n.5 (1984); *see also Carey v. Brown*, 447 U.S. 455, 459 n.2 (1980) (affirming lower court's conclusion that "the labor dispute exception [from a general ban on picketing] was not severable" given that severance would *expand liability* under the statute); *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 102 (1972) (similar). The government's theory would be particularly perverse if applied in the First Amendment context, because it would effectively "requir[e] the [Government] to restrict more speech than it currently does." *Rappa v. New Castle Cnty*, 18 F.3d 1043, 1072–73 (3d Cir. 1994) (Becker & Alito, JJ.). Thus, in *Rappa*, the Third Circuit concluded that, in the First Amendment context, the "severability inquiry [] has a constitutional dimension" and that therefore "the proper remedy for content discrimination generally cannot be to sever the statute so that it restricts more speech than it did before." *Id*. Indeed, in all of its many underinclusiveness cases, the Supreme Court has *never* expanded the speech restriction as a remedy, but instead has always struck the restriction down. *See* Motion, ECF No. 18 at 21-22; *see also Cahaly v. Larosa*, 796 F.3d 399, 405–06 (4th Cir. 2015) (invalidating autodialer restriction, rather than severing its exemptions).

*Third*, the available evidence of congressional intent also precludes severance of the exemption. In weighing severability, the Court does not apply a "mechanical[]" analysis but instead "seek[s] to determine what 'Congress would have intended' in light of the Court's constitutional holding." *U.S. v. Booker*, 543 U.S. 220, 246 (2005) (citation omitted). The history of the TCPA and its expansion is important in this context. As originally enacted by Congress in 1991,

5

the TCPA was intended to combat a particular problem—eliminating robotic dialing by telemarketers of random or sequential telephone numbers (555-0000, 555-0001, and so on). *See* Pub. L. No. 102-243, § 2, ¶¶ 1, 10, 105 Stat. 2394 (1991). That is why the statute prohibits use of dialing equipment "which has the capacity … to store or produce telephone numbers to be called, *using a random or sequential number generator*; and … to dial such numbers." 47 U.S.C. 227(a)(1), (b)(1)(A)(iii) (emphasis added). Such *random* or *sequential* dialing cannot assist in debt collection from *specific* individuals. It was only in July 2015 that the FCC—*not Congress*—expanded potential liability to encompass a far broader range of computerized equipment that is *presently unable* to dial random or sequential numbers, bolstering a national wave of TCPA litigation. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Declaratory Ruling and Order, 30 FCC Rcd 7961, ¶¶ 16, 19 (rel. Jul. 10, 2015). Almost immediately, in November 2015, Congress chose to carve out from liability calls promoting the collection of private, government-guaranteed debts. *See* Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301(a)(1)(B), 129 Stat. 584 (2015). In light of that history, there is no indication that Congress *ever* intended to subject calls promoting collection of government-guaranteed debt to liability, or that Congress would now prefer to do so, rather than to limit liability for other autodialed calls (while leaving in place many other TCPA restrictions, including the do-not-call rules applicable to telemarketing calls). *Cf. Maldonado*, 556 F.3d at 1042 (noting that, after the court enjoined an underinclusive restriction, the legislature cured the defect by broadening its special exemption for commercial speech to also encompass all noncommercial speech).

## C.   The United States' Sovereign Immunity Is Not Relevant

The government argues (at 12-14) that Section 227(b)(1)(A)(iii)'s separate content-based exemption for *all* government messages (and government "authorized" messages) merely reflects the federal government's sovereign

6

immunity, rather than a content preference for government-approved messages. But, as the analysis conducted by numerous courts makes clear (Motion, ECF No. 18 at 9-11), "sovereign immunity" is not relevant to Spectrum's argument that the First Amendment does not permit the government to *privilege its own speech* while simultaneously *suppressing* speech that it disfavors in the same medium, unless the government can justify such discrimination under strict scrutiny.

Just weeks ago, the Ninth Circuit reaffirmed this bedrock principle, concluding that such wholesale exemptions for governmental speakers are subject to First Amendment scrutiny. *Italian Colors Rest. v. Becerra*, No. 15-15873, --- F.3d ---, 2018 WL 266332, at *9 (9th Cir. Jan. 3, 2018). There, the Court held that California's general speech restriction on retailers' ability to charge "surcharges" for credit card payments failed *Central Hudson* intermediate scrutiny,[4] largely because "[t]he state has … broadly exempted itself and its municipalities from the coverage of [the restriction]." *Id.* (reviewing statutory exemptions for a "city, county, or any other public agency"). "That California exempted itself and its subdivisions from the asserted free market protections of [the restriction] suggests that this justification [for the restriction] is thin." *Id.* The Ninth Circuit held that, because the government could not explain "why these exempt [state-imposed] surcharges are any less harmful or deceptive than the surcharges [private] plaintiffs seek to impose," the restriction "does not directly advance the state's interest in preventing consumer deception." *Id.* And although the Ninth Circuit did not discuss California's sovereign immunity, it condemned this exemption of government messages, in spite of the obvious fact that California enjoys sovereign immunity unless waived by statute. *Alden v. Maine*, 527 U.S. 706, 712 (1999); *Brown v. Poway Unified Sch. Dist.*, 4 Cal. 4th 820, 829 (1993).

---

[4] Intermediate scrutiny applied in *Italian Colors*, because, unlike here, the restriction there applied *solely* to commercial speech.

The decision in *Italian Colors* reaffirms abundant, prior Circuit precedent, growing out of Ninth Circuit's warning in *Foti v. City of Menlo Park* that the Court is "troubled by the wholesale exemption for government speech" from speech restrictions. 146 F.3d 629, 637 (9th Cir. 1998). Since then, courts of this Circuit have applied this principle to invalidate "wholesale exemption[s]" for government messages, just like the one here. *See Citizens for Free Speech, LLC v. Cnty. of Alameda*, 194 F. Supp. 3d 968, 986 (N.D. Cal. 2016) (Breyer, J.) (applying strict scrutiny to sign code that exempted "government signs," as "the County's preference for official public signs reflects a preference for that content…."); *Watters v. Otter*, 986 F. Supp. 2d 1162, 1176-1178 (D. Idaho 2013) (Winmill, C.J.) (applying strict scrutiny where speech restrictions at the State Capitol provided exemption for "State Events" "controlled by any state of Idaho agency, board, … or elected official," and invalidating this exemption as an improper "wholesale exemption" of "favored" government messages); *see also Khademi v. S. Orange Cnty. Cmty. Coll. Dist.*, 194 F. Supp. 2d 1011, 1030 & n.18 (C.D. Cal. 2002) (Collins, J.) (finding that college speech code was "unconstitutional to the extent that [it] exempt[s] [State] contractors," and warning that a separate "wholesale exemption" for the State's own speech was potentially unconstitutional as well).

The government urges the Court to disregard this black letter law, arguing (at 12-14) that Section 227(b)(1)(A)(iii)'s exemption of all government messages does not represent any content- or speaker-based discrimination, but rather is simply a reflection of the government's underlying sovereign immunity. But "sovereign immunity" cannot possibly justify Section 227(b)(1)(A)(iii)'s broad preference for all government-approved messages, because the provision exempts messages from *all* governmental entities, including municipalities, counties, and other entities *that have no claim to sovereign immunity*. *Lambert v. Seminole Cty. Sch. Bd.*, No. 6:15-CV-78-ORL-18DAB, 2016 WL 9453806, at *2 (M.D. Fla. Jan. 21, 2016) ("the plain meaning of the TCPA's liability provision excludes

8

governmental entities," including school boards); *Alden*, 527 U.S. at 756 (sovereign immunity "does not extend to … a municipal corporation or other governmental entity which is not an arm of the State"). Section 227(b)(1)(A)(iii) imposes liability only on "persons," and 47 U.S.C. § 153(39) defines a "person" as "includ[ing] an individual, partnership, association, joint-stock company, trust, or corporation." *Id.* "Government" does not appear on that list. *Id.*; *cf. Seitz v. City of Elgin*, 719 F.3d 654, 656 (7th Cir. 2013) (discussing similar statutory term). Thus the City of Los Angeles, Los Angeles County, and other "government bodies may freely … express[] their political preferences, their positions on public policy … [and] their chosen messages on virtually any subject" while a private person "could not freely … advocate[e] the opposing position," requiring strict scrutiny. *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1265-6 (11th Cir. 2005). This is a feature of the *statutory text*, not a result of any immunity.[5]

Even with respect to the federal government, which—in contrast to the thousands of municipalities, counties, and other local governmental entities exempted by Section 227(b)(1)(A)(iii)—actually *does* enjoy sovereign immunity,

---

[5] The definition of "person" also exempts from liability all government *agents*, meriting strict scrutiny on that basis as well. *Compare Campbell-Ewald v. Gomez*, 136 S. Ct. 663, 673–75 (2016) (holding that because government agents do not share the government's absolute sovereign immunity, they would not be immune from violating a right clearly established by the TCPA), *with Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Declaratory Ruling, 31 FCC Rcd 7394, ¶¶ 1, 10, 11 (rel. Jul. 5, 2016) (clarifying that, irrespective of immunity principles, the TCPA universally exempts all federal government agents because they are not "persons," so long as they follow the government's "instructions"). That *statutory* favoritism for *government-approved messages* conveyed by agents extends far beyond the limits of these agents' sovereign immunity, and cannot be justified under that immunity. The government also argues (at 14 n.9) that because the FCC clarified that such agents are not "persons," this exemption for agents is immune from review under the Hobbs Act. That is wrong: the exemption for agents as non-"persons" is a feature of the *statutory text*, not a result of agency action subject to the Hobbs Act.

courts have found no difficulty in applying the anti-discrimination principle articulated in *Italian Colors*, *Foti*, *Citizens for Free Speech*, and *Solantic* to the federal government, in spite of its sovereign immunity.  *See, e.g.*, *A.N.S.W.E.R. Coal. v. Kempthorne*, 537 F. Supp. 2d 183, 196–97, 205 (D.D.C. 2008) (National Park Service must "subject itself to the same permitting regulations as other applica[nts]" and may not privilege "[g]overnment-sponsored displays").  That is because equal treatment of speakers and messages *does not require the federal government to waive its sovereign immunity*, nor to restrict its own speech when it restricts private speech. The government has multiple options available to eliminate this unconstitutional discrimination, without waiving its sovereign immunity—for example, by (i) privileging government messages only when that preference is narrowly tailored to a compelling interest—as with a host of public safety applications; (ii) imposing a uniform restriction on *all* autodialed and prerecorded messages, without granting a private right of action for damages or injunctive relief against the government; or (iii) eliminating the restrictions that uniquely target disfavored, private messages.[6]

Finally, the government argues (at 14) that the preference for government messages "does not suppress *any* speech … rather, it simply requires that a caller secure the consent of the called party before employing ATDS technology."  But the FCC has taken the opposite position, emphasizing that Section 227(b)(1)(A)(iii)'s restrictions "significantly constrain" and "severely impair" the "ability to communicate with the public" by posing a "significant obstacle" "imped[ing]" the free dissemination of information, and increasing the cost of speech.  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Declaratory Ruling, 31 FCC Rcd 7394, ¶¶ 15, 19 (rel. July 5, 2016).  In any event, "[t]he government's content-based burdens

---

[6] Accordingly, the rule of *Italian Colors* and *Solantic* does *not* create a "Sophie's Choice … by requiring Congress to abrogate sovereign immunity every time it s[eeks] to restrict private speech."  *Mejia*, 2017 WL 3278926, at *15.

1  must satisfy the same rigorous scrutiny as its content-based bans." *U.S. v. Playboy*

2  *Entm't Grp.*, 529 U.S. 803, 812 (2000). Moreover, "[a] statute is presumptively

3  inconsistent with the First Amendment" where, as here, "it imposes a financial

4  burden on speakers because of the content of their speech" or the identity of the

5  speaker. *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,

6  502 U.S. 105, 115 (1991). Strict scrutiny therefore is required here.

7       Spectrum also has identified more than ample indicia that this preference for

8  government speakers "reflects a content preference" for government messages (and

9  government "authorized" messages) over private speech, requiring strict scrutiny,

10  *Reed*, 135 S. Ct. at 2230. *See* Motion, ECF No. 18 at 8-9 (collecting legislative and

11  regulatory sources). Indeed, this Court has held that such a statutory design,

12  without more, may suffice to show an impermissible speaker-based distinction that

13  "reflects a content preference." *See www.RicardoPacheco.com v. City of Baldwin*

14  *Park*, No. 2:16–cv–09167–CAS(GJSx), 2017 WL 2962772, at *6 (C.D. Cal. July

15  10, 2017) (Snyder, J.); *see also Solantic*, 410 F.3d at 1265-66 (similar).

16      **D.  Spectrum May Challenge The Provision's Application to All**
17          **Speech, Including Noncommercial Speech**

18       Plaintiff argues (at 7-8) that Spectrum cannot raise its challenge under strict

19  scrutiny because Spectrum's speech supposedly is purely "commercial," and

20  Spectrum has not shown substantial overbreadth. Plaintiff's argument about

21  "overbreadth" is beside the point, because even if he were right, Section

22  227(b)(1)(A)(iii) is subject to strict scrutiny for multiple other independent reasons

23  aside from its overbreadth. *See* Motion, ECF No. 18 at 12-13; *Comite de*

24  *Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 945 n.2

25  (9th Cir. 2011) (because ordinance did "not limit its reach to the commercial

26  context," "we cannot, and do not, decide the Ordinance's validity under the

27  Supreme Court's 'commercial speech' case law"). Regardless, Plaintiff is simply

28  wrong: even the government acknowledges (at 14-15) that Spectrum may raise a

challenge to Section 227(b)(1)(A)(iii)'s application to noncommercial speech. While Plaintiff argues that Spectrum has failed to show the provision's "unconstitutional sweep is substantial as compared to its permissible applications," it is difficult to imagine more substantial overbreadth than a provision that restricts *all* private messages (except select, favored content).  Plaintiff hypothesizes that the "bulk of the TCPA's applications are to commercial speech," notwithstanding that the statute applies to *all* noncommercial private speech, including political speech, which has been repeatedly subjected to liability in suits against (*inter alia*) political candidates and their campaigns.  *See infra* at 29.  Thus, Spectrum's challenge warrants review under strict scrutiny.[7]

### E.  The Hobbs Act Does Not Apply

The government argues (at 15-18) that Section 227(b)(1)(A)(iii)'s preferences for calls concerning package deliveries, bank transactions, healthcare appointments, and other favored subjects are immune from review because Spectrum did not bring its challenge in the court of appeals, pursuant to the Hobbs Act.  *See* 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1).  But, far from challenging any FCC order, Spectrum challenges *Section 227(b)(1)(A)(iii)* as a content-based restriction that is riddled with numerous content-based preferences.  And Spectrum *accepts* for purposes of its motion that the FCC has properly exercised its authority to promulgate these content-based exemptions to the statutory provision.

The government argues (at 16-17) that the Court is required to reinterpret Spectrum's challenge to the *statute* as one that places "the legitimacy of th[e] FCC

---

[7] Plaintiff is also putting far more weight on the distinction between facial and as-applied challenges than is warranted here, given that Spectrum is a *defendant* seeking to prevent enforcement of an unconstitutional statutory provision against itself.  *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010) ("the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or … control[s] … the disposition in every case … [instead,] it goes to the breadth of the remedy").

1   orders in question." But the text of the Hobbs Act cannot be stretched so far as to
2   preclude Spectrum's challenge to the *statutory* speech restriction. *See* 28 U.S.C.
3   § 2342(1) (reserving "exclusive jurisdiction to *enjoin, set aside, suspend ... or to*
4   *determine the validity* of" FCC orders) (emphasis added). The government's cases
5   are not to the contrary: in *Wilson v. A.H. Belo Corp.*, the Ninth Circuit held that the
6   issuance of an FCC declaratory ruling establishing the FCC's exclusive authority
7   over advertising rates divested the district court of jurisdiction to rule on those
8   rates. 87 F.3d 393, 399-400 (9th Cir. 1996). Nowhere did *Wilson* hold that where
9   a party challenges a content-based *statute*, the Court must reinterpret that challenge
10  as a challenge to the statute's *implementing regulations*. On the contrary, *Wilson*
11  held that for the Hobbs Act to apply, what "is required is that the [motion] filed in
12  the district court raise the same issues and seek the same relief in substance as the
13  [FCC's] declaratory ruling." *Id.* Here, the relief Spectrum seeks—a ruling that 47
14  U.S.C. § 227(b)(1)(A)(iii) cannot be constitutionally applied to Spectrum—was
15  neither an "issue" raised before the FCC, nor the "relief" provided by the FCC's
16  orders when it established its content-based exemptions. *See* Motion at 6 n.4-7.

17       Nor did *Wilson* hold that, where a statute is riddled with content-based
18  distinctions implemented by regulation, the Court must blind itself to those
19  distinctions. At least one court has squarely rejected the government's position,
20  holding that a party's argument "that the FCC's orders are evidence showing the
21  [TCPA's] autodialing ban is content-based," like Spectrum's argument here, does
22  not entail an effort "to show that the FCC's orders delineating … exceptions to the
23  autodialing ban are void or invalid. Merely referencing FCC orders does not make
24  the … proceeding one to enjoin, set aside, annul, or suspend those orders within
25  the meaning of 47 U.S.C. § 402(a)." *Am. Ass'n of Political Consultants*, 2017 WL
26  1025808, at *2. In short, the government's view of the Hobbs Act (at 17) is
27  incorrect and unworkable: on that theory, a court could never invalidate *any*
28  provision of the Communications Act for which the FCC has promulgated

1   implementing regulations, as that would impermissibly have the "practical effect"

2   of "invalidat[ing]" those regulations.  That is plainly not the law.

3         Plaintiff similarly argues (at 9 n.4) that the Ninth Circuit has already

4   determined that Spectrum's challenge is barred, on the theory that Spectrum is

5   challenging the "regulations implementing the TCPA," which are "outside the

6   purview of a district court." (citing *Moser*, 46 F.3d at 974).  But *Moser* stands for

7   precisely the opposite proposition: the Ninth Circuit there *accepted* the

8   challenger's "insist[ence] [that] they expressly challenge the statute and only the

9   statute," and *rejected* the FCC's position that such a statutory "challenge

10  necessarily is to the regulations" implementing the TCPA.  *Moser*, 46 F.3d at 973.[8]

11        Nor can the Hobbs Act preclude Spectrum's separate challenge to the

12  *statutory* authorization for the FCC to exercise unbridled discretion in

13  promulgating such content-based exemptions.  *See* Motion at 6 (citing 47 U.S.C.

14  § 227(b)(2)(C)).  Such unbounded discretion cannot be validly vested in an

15  administrative agency.  *See Long Beach Area Peace Network v. City of Long*

16  *Beach*, 574 F.3d 1011, 1042 (9th Cir. 2009) (unbridled discretion doctrine applies

17  to "legislative," "executive," and "administrative" actors).  Nor is that doctrine

18  limited to the context of permitting and prior restraints.  *See Hopper v. City of*

19  *Pasco*, 241 F.3d 1067, 1079 (9th Cir. 2001).  Accordingly, Spectrum's separate

20   

---

21  [8] Plaintiff and the government's erroneous construction of the unambiguous Hobbs

22  Act would yield other perverse consequences as well. While the Hobbs Act

23  requires that any challenge to an FCC order be brought within 60 days of its
    promulgation, 28 U.S.C. § 2344, the FCC's content-based exemptions were first

24  promulgated over *three years* before Spectrum became subject to suit here, in July

25  2017.  *See* Motion at 6 n.4-7.  The Hobbs Act should not be distorted to
    permanently ossify the statute's discrimination, and foreclose Spectrum (and all

26  others) from *ever* challenging liability under the application of an unconstitutional

27  law.  Indeed, the government's unreasonable interpretation would raise serious
    Due Process concerns.  *See Philip Morris USA v. Williams*, 549 U.S. 346, 353

28  (2007) ("Due Process" means "an opportunity to present every available defense").

challenge to the statutory grant of authority to the FCC to promulgate serial content-based exemptions for favored messages may proceed here as well.

## II. BECAUSE SECTION 227(b)(1)(A)(iii) RESTRICTS SPEECH IN A MANNER THAT IS CONTENT AND SPEAKER BASED, STRICT SCRUTINY APPLIES

The government (at 5 n.1) and Plaintiff (at 14) acknowledge that four recent decisions have addressed the government-backed debt exemption, and each held that Section 227(b)(1)(A)(iii) was content-based and subject to strict scrutiny.[9] The government (at 5-7, 10-12) and Plaintiff (at 11) nonetheless urge this Court to conclude that Section 227(b)(1)(A)(iii) is content neutral, because it purportedly contains only a "relationship-based" debt collection exception.  But liability under Section 227(b)(1)(A)(iii) plainly turns on the *content* of a call, not the *relationship* of the caller and recipient.  For example, when a homeowner takes out a private, government-backed mortgage, *anyone* is free to call the borrower, regardless of their relationship, as long as the call is "made solely to collect a debt … guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii).   Yet a call between a borrower and a lender *remains subject to liability* if the *content* of that call is not designed "*solely* to collect a debt … guaranteed by the United States." *Id*. (emphasis added).  For example, if that lender also mentioned on the call that it offered affordable checking accounts, liability would ensue.  The Court need not review the parties' relationship—only the call's content—to determine whether the provision applies, rendering the provision "content based on its face." *Mejia*, 2017 WL 3278926, at *14.  Thus, the government's citation to *Patriotic Veterans Inc. v. Zoeller* is inapposite, given that there the state-law distinctions among autodialed calls turned exclusively on the relationship of the caller and recipient (employee-employer, school-student, business-customer, and so on).   ECF No. 38 at 10-11

---

[9] *Brickman*, 230 F. Supp. 3d at 1045; *Holt*, 240 F. Supp. 3d at 1032; *Mejia*, 2017 WL 3278926, at *15; *Greenley v. Laborers' Int'l Union of N. Am.*, 16-cv-03773-WMW, 2017 WL 4180159, at *13 (D. Minn. Sept. 19, 2017).

1    (citing *Patriotic Veterans,* 845 F.3d at 304-05).   By contrast, courts have

2    consistently rejected the theory that the government-backed debt exception is

3    "relationship based."  *See, e.g.*, *Brickman*, 230 F. Supp. 3d at 1045 ("the exception

4    makes no reference whatsoever to the relationship of the parties."); *Greenley*, 2017

5    WL 4180159, at *12.[10]   And because the provision is not content neutral, it cannot

6    be a mere "time, place, and manner restriction" entitled to less rigorous scrutiny, as

7    both the government (at 10) and Plaintiff (at 8) erroneously assert.  *Reno v. ACLU*,

8    521 U.S. 844, 879 (1997) (where a restriction "regulates speech on the basis of its

9    content," "[a] 'time, place, and manner' analysis is … inapplicable").

10        The government also claims (at 11) that the government-backed debt

11   collection exemption is a reflection of "sovereign immunity" or "government

12   speech," as it "protect[s] those who are collecting debts that the government could

13   undoubtedly collect in the same manner itself."   As with the government's other

14   attempts to invoke sovereign immunity, that is wrong: this exception exempts from

15   liability *private* callers collecting *private,* government-guaranteed debts, including

16   private student loans and mortgages.   Those private entities do not enjoy any

17   sovereign immunity or ability to engage in "government speech."

18

19

20

---

21   [10] The government points (at 10) to the FCC's ruling that for a call to be made
22   "solely to collect" a government-backed debt, it must "be made to the debtor…."
     *Rules and Regulations Implementing the Telephone Consumer Protection Act of*
23   *1991*, CG Docket No. 02-278, Report and Order, 31 FCC Rcd. 9074, ¶ 13 (2016)
24   ("FCC 2016 Order").   That a call must be placed *to the debtor* has no bearing on
     the relationship between the *caller and the recipient*, as it remains the case that
25   *anyone* can call a debtor to collect a government-backed debt without any liability,
26   regardless of whether they have a relationship with the debtor.   And in any event,
     this exception still requires the Court to review the call's content to determine
27   liability, given that any *content* that does not serve to "collect a debt … guaranteed
28   by the United States" remains subject to liability.   47 U.S.C. § 227(b)(1)(A)(iii).

## III.   THE GOVERNMENT AND PLAINTIFF FAIL TO SHOW THAT THE PROVISION WITHSTANDS STRICT SCRUTINY

"Content-based regulations are presumptively invalid," *Hoye v. City of Oakland*, 653 F.3d 835, 853 (9th Cir. 2011), and "almost always violate the First Amendment," *DISH Network Corp. v. FCC*, 653 F.3d 771, 778 (9th Cir. 2011); *see also Nat'l Advert. Co. v. City of Orange*, 861 F.2d 246, 249 (9th Cir. 1988) ("The Constitution forbids the selective prohibition of protected noncommercial speech based on its content."). To overcome this heavy presumption of invalidity, the government (or plaintiff) must prove that the content-based restriction is narrowly tailored to advance a compelling government interest. *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011) (once the "moving party" makes "a colorable claim that its First Amendment rights … are threatened with infringement," "the burden shifts to the government to justify the restriction.").

To sustain this burden under strict scrutiny, the government (or Plaintiff) must "proffer … *evidence*" that the government's asserted interests are actually compelling in this *specific factual context*. *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 962 (9th Cir. 2009) (emphasis added) (acknowledging compelling interest in protecting children's psychological development, but holding that there was insufficient record evidence indicating that restricted video games actually caused that harm). Critically, such evidence must justify the "content-based [] distinction," not merely the general speech restriction. *Carey*, 447 U.S. at 465. And then *the government or Plaintiff* must prove through *evidence* that the provision is narrowly tailored, and neither overinclusive nor underinclusive to its interests. *Nader v. Brewer*, 531 F.3d 1028, 1037 (9th Cir. 2008) (the government necessarily fails to prove narrow tailoring when it "does not provide any evidence"); *Playboy Entm't Grp.* 529 U.S. at 822; *Edenfield v. Fane*, 507 U.S. 761, 771-72 (1993).

Not only have the government and Plaintiff utterly failed to advance

17                                                    Case No. 5:17-cv-01361-CAS-KK

evidence that could carry their burden,[11] but this same flaw undermines the four prior district court decisions upholding the provision under strict scrutiny, *supra* n.9.  Those courts incorrectly *reversed the parties' burdens*, and then upheld the statute absent any *evidence* that (i) the government has *any* legitimate interest in its content-based *distinctions*; (ii) the statute's exemption of preferred speech does not meaningfully undermine that interest; and (iii) less restrictive alternatives are unavailable.  The Court should decline to follow those erroneous decisions.

With those principles in mind, it is clear that Spectrum is entitled to judgment in its favor.  Neither Plaintiff nor the government advances *any* justification for either (i) the blanket exemption of all government messages, or (ii) the FCC's patchwork of favored messages.  It necessarily follows that these content-based distinctions render Section 227(b)(1)(A)(iii) invalid and unenforceable under any type of heightened scrutiny.

Similarly, the government-backed debt collection exemption provides an independent basis for judgment.  Plaintiff (at 14-18) and the government (at 18-22) at least attempt to justify that distinction, but their attempts to do so fail for the

---

[11]  On a motion for judgment on the pleadings, the Court's consideration of evidentiary matter is constrained.  However, the government's required showing to sustain the restriction must, as always, be met through citation to the congressional record and other pre-enactment materials establishing a compelling interest and narrow tailoring, which would be entitled to judicial notice at this stage under Fed. R. Evid. 201(b)(2).  *See Desert Outdoor Advert. v. City of Moreno Valley*, 103 F.3d 814, 819 (9th Cir. 1996); *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989) (invalidating restriction where the pre-enactment record contained "no legislative findings that would justify us in concluding that there is no … less restrictive [alternative]").  Moreover, the government has not argued that it could introduce any further evidence to discharge this burden.  Nor did the government exercise its prerogative to request that this motion be converted to one for summary judgment and then submit such evidence.  Accordingly, the constitutionality of Section 227(b)(1)(A)(iii) is now ripe for adjudication, as the government and Plaintiff appear to agree.  *See* ECF No. 38 at 23 (arguing the provision "survives strict scrutiny"); ECF No. 39 at 14 (same).

multiple reasons discussed below.

### A. "Residential Privacy" And "Revenue Collection" Are Not "Compelling" Interests Justifying Content-Based Restrictions

The government asserts (at 18-19) that it is "well settled that the government has a compelling interest in protecting … privacy." But the binding rule of this Circuit is to the contrary. *See Hoye*, 653 F.3d at 852. In *Hoye*, the Ninth Circuit invalidated a content-based restriction on anti-abortion protestors' highly "intrusive" speech directed at patients entering abortion clinics. *Id.* The Ninth Circuit noted that "[i]n some cases, government regulation of speech with the aim of protecting the dignity and privacy of individuals has been permitted," including in cases establishing the exceptional "privacy of the home." *Id.* "But such cases *do not sanction content-based restrictions*. They only accept the dignity and privacy rationale as a sufficiently strong governmental interest to justify a content-neutral time, place, and manner restriction." *Id.* (emphasis added). Similarly, in *Klein v. City of San Clemente*, the Ninth Circuit concluded that "privacy" was not a sufficiently strong interest to sustain *content-neutral* restrictions on *residential* leafletting, much less leafletting of parked vehicles, and adopted the California Supreme Court's holding that a government "'cannot … preserve [residential] privacy … by prohibiting all distribution [of leaflets] without prior consent.'" 584 F.3d 1196, 1205, 1207 (9th Cir. 2009) (quoting *Van Nuys Publ'g Co. v. Thousand Oaks*, 5 Cal. 3d 817, 827 (1971)).

Contrary to both Plaintiff's (at 14-15) and the government's (at 18-19) representations, *none* of their cited appellate authorities *actually* concluded that "privacy" is a "compelling" state interest, or can justify a *content-based* speech restriction. For example, in *Carey v. Brown*, the Supreme Court acknowledged that residential privacy is an interest "of the highest order," but *expressly held* that it is *not* sufficiently compelling to sustain a *content-based* restriction on residential picketing: instead, the government "may protect individual privacy by enacting …

19

regulations applicable to all speech *irrespective of content.*"   447 U.S. at 470 (emphasis in original); *compare Frisby v. Schultz*, 487 U.S. 474, 484 (1988) ("*significant* government interest" in "residential privacy" justified *content neutral* residential picketing restriction) (emphasis added); *see also Perry v. Los Angeles Police Dep't*, 121 F.3d 1365, 1369 (9th Cir. 1997) (confirming that *Carey* identified a "*substantial* interest in protecting residential privacy"); *Berger v. City of Seattle*, 569 F.3d 1029, 1039 (9th Cir. 2009) (noting that at the "citizen's doorstep," "substantial privacy interests exist"); *Kirkeby v. Furness*, 92 F.3d 655, 659 (8th Cir. 1996) ("[T]he Supreme Court has never held that [residential privacy] is a compelling interest … and we do not think that it is."). Thus, in *Patriotic Veterans, Inc. v. Zoeller*, the Seventh Circuit found that privacy was merely a "legitima[te] … state[] goal" sufficient to justify a *content neutral* restriction on autodialers.  845 F.3d at 305. To the extent some district courts have recently discovered a new "compelling" interest in privacy sufficient to sustain this *content-based* speech restriction, which is unknown to both the courts of appeals and the Supreme Court, this Court should decline to follow their lead.

Indeed, the very existence of the government-backed debt exception establishes that privacy is *not* a compelling interest sufficient to restrict protected speech based on its content. *See National Advertising*, 861 F.2d at 249 (the government's "allowance of some billboards [is] evidence that its interests in traffic safety and aesthetics … [fall] shy of 'compelling'"); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546-47 (1993) ("Where … [the] government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling."). And the Ninth Circuit has only held that Section 227(b)(1)(A)(iii)'s protection of privacy is a "significant interest." *Campbell-Ewald Co.*, 768 F.3d at 876; *Moser*, 46 F.3d at 974. But a "significant" interest is

insufficient to sustain a *content-based* law. This is unsurprising: because "privacy" amounts to little more than the right to be free of unwelcome speech, identifying a new "compelling" interest in privacy here would grant the government nearly unlimited discretion to pick and choose "desirable" and "undesirable" messages to restrict based on their content, turning the First Amendment on its head.

Likewise, the Ninth Circuit has never held that revenue collection is a sufficiently compelling interest to justify *content-based* speech restrictions, and in fact has strongly suggested that it would not do so. *See Sudomir v. McMahon*, 767 F.2d 1456, 1466 n.14 (9th Cir. 1985) (under strict scrutiny applicable to Equal Protection alienage claims, "a concern for fiscal integrity is not a compelling justification for an otherwise invidious classification"); *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1071 (9th Cir. 2011) (under statutory form of strict scrutiny applicable to RLUIPA claims, noting that "revenue generation is not a compelling state interest"). Instead, collection of government revenue is, at most, a lesser "legitimate interest," *Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999) (Free Exercise claim), or a "substantial" interest, *Maldonado*, 556 F.3d at 1048 (sustaining *content neutral* speech restriction); *see also Ark. Writers' Project, Inc.*, 481 U.S. at 231-232 ("interest in raising revenue" failed to justify *content-based* sales tax). Indeed, if the government had a compelling interest in selectively restricting unprofitable content, the government could potentially justify restrictions on, for example, speech advising on lawful tax reduction strategies, or even speech advocating decreases in taxation. The Court should decline to discover such new "compelling" interests here.

### B.   The Government And Plaintiff Fail To Identify Evidence Demonstrating That The Content-Based Restriction Advances A Compelling Interest

The government and Plaintiff also fail to discharge their burden to show with *evidence* that their proffered interests are actually compelling in this *specific factual context. Video Software Dealers Ass'n*, 556 F.3d at 962. Nor have they

21

1    proven that the provision's *content-based distinctions* advance a compelling
2    interest. *Carey*, 447 U.S. at 465 (invalidating statute, as "nothing in the content-
3    based labor-nonlabor distinction has any bearing whatsoever on privacy").

4        As an initial matter, as to the alleged interest in privacy, *residential* privacy
5    is not even implicated here, given that autodialed calls to wireless devices are often
6    received outside the home. Even more importantly, autodialed calls can be simply,
7    automatically, and preemptively blocked using readily available, free applications.
8    In addition, many calls go unanswered, do not ring, or are rejected by the recipient.
9    Yet *all* such calls are subject to liability, absent any record evidence they *actually*
10   harm privacy. Indeed, many call recipients desire to receive messages originating
11   from computerized equipment, including cable installation appointment reminders;
12   nonprofit, charitable, and religious messages; and political speech. *Compare*
13   *Klein*, 584 F.3d at 1204-5 (restriction on leafletting did not advance a substantial
14   interest, since "vehicle owners … may want to receive [challenger's] speech").
15   The government has not advanced any evidence to show that subjecting *all*
16   autodialed calls to liability (except content preferred by the government) is actually
17   necessary to prevent harm to a compelling interest in privacy.

18       And while Plaintiff (at 3-4) and the government (at 7) rely on the Congress's
19   findings concerning the *original 1991 enactment*, which found that *scattershot*
20   "random or sequential" mass spam dialing almost always harms privacy, they
21   ignore the updated restriction at issue here. Indeed, now that the term "ATDS"
22   (*i.e.*, an autodialer) has been interpreted to include all devices with merely the
23   "potential" future capacity to dial such random numbers,[12] including consumer
24   smartphones and tablets[13] that dial *specific* recipients to deliver *desired* messages,
25   there is no evidence that such a broad restriction targets technologies that "pose[]

26   ────────────────
     [12] *See* Declaratory Ruling and Order, CG Docket No. 02-278, 30 FCC Rcd 7961,
27   ¶¶ 16, 19 (rel. Jul. 10, 2015).

28   [13] *Id.* at 8075, Dissenting Statement of Commissioner Ajit Pai.

1    … dangers that were in fact real before the enactment of [the restriction]," or

2    "actually alleviates these harms to a material degree," *Italian Colors Rest.*, 2018

3    WL 266332, at *9.  At least one court has cautioned that, even under intermediate

4    scrutiny, "[t]he breadth of the concept of privacy requires … particular attention to

5    attempts by the government to assert privacy as a substantial state interest," and

6    accordingly "privacy may only constitute a substantial state interest if the

7    government specifically articulates and properly justifies it" with evidence.  *U.S.*

8    *West v. FCC*, 182 F.3d 1224, 1234-35 (10th Cir. 1999).  Here, Plaintiff and the

9    government have provided no real identification of the specific privacy interest at

10   stake, much less any justification as to why it is important (let alone compelling) in

11   this context to restrict messages conveyed through consumer cell phones and

12   tablets, computers, and other technologies used by individuals, including live

13   callers, to convey desired messages to specific individuals.

14        This problem is particularly acute with respect to the government's

15   impermissible "post hoc rationalization[]" of a purported "compelling"

16   government interest in revenue collection.  *Bourgeois v. Peters*, 387 F.3d 1303,

17   1322-1323 (11th Cir. 2004).  Absent any probative legislative history or findings,

18   the government necessarily has failed to meet its burden to advance *evidence* that

19   the cited harms "are real," *Berger*, 569 F.3d at 1049, or that the restriction is

20   "actually necessary to protect" that interest, *Animal Legal Def. Fund v. Wasden*,

21   No. 15-35960, --- F.3d ---, 2018 WL 280905, at *8 (9th Cir. Jan. 4, 2018).  While

22   the government claims (at 20) that the interest in the "public fisc" is "no mystery,"

23   in fact, ***the Congressional Budget Office reviewed the government-backed debt***

24   ***exemption and projected no material financial impact from it***.  CBO, Estimate of

25   the Budgetary Effects of H.R. 1314, the Bipartisan Budget Act of 2015, at 1, 4,

26   *available at* https://www.cbo.gov/publication/50938 (discussing Section 301 of the

27   Budget Act of 2015); Letter from National Consumer Law Center, CG Docket No.

28   02-278 (Mar. 28, 2016), *available at* https://ecfsapi.fcc.gov/file/60001561632.pdf

("the Congressional Budget Office did not believe that passage of this amendment to the TCPA would result in any additional collections for the U.S. Treasury"). Instead, it appears this "special exemption" from liability for private debt collection serves to "bestow[] regulatory largesse upon favored industries" placing such calls, rather than *actually* promoting collection of revenue, and all the while undermining the purported compelling interest in privacy.  Dissenting Statement of Commissioner Pai, FCC 2016 Order, 31 FCC Rcd. at 9123.  The Ninth Circuit has cautioned against assuming, as the government does, that a statute serves an interest, absent *evidence* that it does so, as purported "'common sense … can all-too-easily be used to mask unsupported conjecture, which is, of course, verboten in the First Amendment context.'"  *Klein*, 584 F.3d at 1204.

In sum, the government "has not provided any evidence" that its asserted interests are truly compelling in this case, *Berger*, 569 F.3d at 1046, much less that "exempting speech facilitating" debt collection *actually* promotes revenue collection,   *Hoye*, 653 F.3d at 853, or is remotely "necessary to promote [that] objective," *Berger*, 569 F.3d at 1046.

## C.   The Government and Plaintiff Fail To Identify Evidence Demonstrating That The Provision's Content-Based Distinctions Are Narrowly Tailored

The government and Plaintiff also provide "no evidence," as they must, that the provision's *content-based distinctions* and *exemptions* from liability are "narrowly tailored" to a compelling interest.  *Perry*, 121 F.3d at 1370.

> *1.   The provision is not narrowly tailored because it privileges the most intrusive, commercial speech over core protected speech.*

Section 227(b)(1)(A)(iii)'s exemption of the most intrusive commercial speech, while restricting less burdensome protected speech, represents the *opposite* of narrow tailoring.  Far from the debt collection exemption being a tightly "cabined" "minor carve-out" as the government claims (at 20-21), Spectrum has provided extensive evidence that such calls seeking to collect private, government-

24

backed debts "are prolific and raise *much more pervasive* privacy concerns than many other types of restricted calls."  Motion at 19-20 & n.9.  For example, in August, Senators Markey and Lee wrote to FCC Chairman Pai that "many borrowers" of such guaranteed loans, including "student loan borrowers, mortgage borrowers, veterans, [and] farmers" are receiving "multiple robocalls a day without providing consent or having the ability to stop" "these abusive and invasive robocalls."  Aug. 4, 2017 Letter, *available at* www.markey.senate.gov/imo/media/doc/2017-08-04-DebtCollector-RoboCalls%20.pdf ("Markey-Lee Letter").

Plaintiff concedes (at 16-18) that the government-backed debt exception "may diminish … the achievement of the statute's privacy-protection purposes," although he claims it does so only to an "incremental degree," causing "negligible damage."  While the burden is on *Plaintiff* (and the government) to prove through *evidence* that the impact of such calls is "negligible," and they have failed to carry that burden, the available evidence indicates these debt collection calls cause more than "appreciable damage" to privacy.  *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002).  For example, the Department of Education reports that of a total portfolio of over $188 billion in private, federally guaranteed student loans through the Federal Family Education Loans ("FFEL") program, approximately $65 billion are in default, impacting 4 million student borrowers.[14]  The National Council of Higher Education Loan Programs ("NCHELP"), an industry trade group, has explained to the Federal Trade Commission that "[t]he vast majority of student loan debt collection activities" for the federally guaranteed FFEL Program "are outsourced to [private collection agencies]," and that "[t]he use of cell phones as an alternate, and often exclusive, means of verbal communication is becoming

---

[14] Department of Education, Portfolio by Loan Status (DL, FFEL, ED-Held FFEL, ED-Owned), https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

the norm."[15]  "As with [calls to] cell phones, the use of texting technology [for debt collection] is most often coupled with an automated dialing process."  *Id.*  That is far from a "negligible" infringement on "privacy," particularly in light of Congress's finding that "subscribers consider automated … calls, *regardless of the content or the initiator of the message*, to be a nuisance and an invasion of privacy."  Pub. L. No. 102-243, § 2, ¶ 10, 105 Stat. 2394 (1991) (emphasis added).

Likewise, the Treasury most recently reported that of $850 billion in outstanding private, government-guaranteed mortgages, 11.4% were in default, amounting to 574,716 mortgages, the collection of which is exempt from Section 227(b)(1)(A)(iii)'s restrictions.[16]   In June 2016 comments before the FCC concerning the recently enacted government-backed debt collection exemption that Spectrum now challenges here, the Consumer Financial Protection Bureau reported that it "receives more complaints about debt collection than any other single industry (around 80,000 per year)," pursuant to its supervisory authority over, *inter alia*, collectors of "mortgage and student loan debt" "guaranteed by the federal government."[17]   "[C]onsumer harms from excessive debt collection calls … include the interruption or inconvenience of such calls, emotional distress, and monetary harms, such as charges to mobile phone plans."  *Id.*

Thus, although the burden is on the government to establish through evidence that the content-based preference for government-backed debt collection

---

[15] Letter from NCHELP to Federal Trade Commission, Office of the Secretary, "Public Workshop: Debt Collection 2.0: Protecting Consumers as Technologies Change" (Apr. 7, 2011), *available at* https://www.ftc.gov/sites/default/files/documents/public_comments/ftc-workshop-debt-collection-2.0-protecting-consumers-technology-changes-project-no.p114802-00008%C2%A0/00008-58349.pdf.

[16] Office of the Comptroller of the Currency, Mortgage Metrics Report, Q3 2015 at 4, 9, 14, *available at* http://www.occ.treas.gov/publications/publications-by-type/other-publicationsreports/mortgage-metrics/mortgage-metrics-q3-2015.pdf.

[17] Letter from Consumer Financial Protection Bureau to FCC, Office of the Secretary (June 6, 2016), *available at* https://ecfsapi.fcc.gov/file/60002112663.pdf.

calls is narrowly tailored (which it has not), *Nader*, 531 F.3d at 1037, Spectrum has provided substantial evidence demonstrating that this preference *exempts* calls that are among the *most problematic, "commercial" speech*, while restricting less burdensome speech, including desired communications between a service provider and its customers, as well as political speech and nonprofit speech.  Motion at 19-20 & n.9.  Indeed, although "[c]omplaint statistics show that unwanted commercial calls are a far bigger problem than unsolicited calls from political or charitable organizations," H.R. Rep. No. 102-317, at 16 (1991), such "commercial" calls relating to government-backed debt are *exempt* from liability.  Spectrum is unaware of any case in which the Ninth Circuit has ever upheld under strict scrutiny a speech restriction justified by a "compelling" interest, which exempts speech *equally or more damaging* to that interest than the speech that is restricted.  Indeed, the rule of this Circuit is to the contrary. *Perry*, 121 F.3d at 1370; *Italian Colors Rest.*, 2018 WL 266332, at *9.  Plaintiff's repeated citation (at 15-17) to *Williams-Yulee v. Fla. Bar* therefore could not be further off the mark: there, the Supreme Court held that a restriction on direct judicial fundraising was narrowly tailored, because the exempt speech (*i.e.,* indirect campaign committee fundraising) posed a "*categorically different and [less] severe risk*" of harm than the restricted speech.  135 S. Ct. 1656, 1669 (2015) (emphasis added).  But here, the provision *exempts* speech that poses *an identical or greater risk to privacy* than the restricted speech.  That is the *opposite* of narrow tailoring.

Plaintiff also is wrong to argue that "the determinative question is not whether a statutory exception serves a compelling interest," but instead whether the exception has the result that "the statute as a whole no longer sufficiently serves the … interest invoked to justify it."  ECF No. 39 at 17 (citing *Williams-Yulee*, 135 S. Ct. at 1668).  To the extent Plaintiff is suggesting that it suffices that Section 227(b)(1)(A)(iii) still manages, to some degree, to protect privacy, he is mistaken: "[u]nderinclusivity creates a First Amendment concern" *not only* when

27

exemptions so thoroughly compromise a restriction that it no longer serves its purposes, *but also* "when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*." *Williams-Yulee*, 135 S. Ct. at 1670 (emphasis in original). For example, in *Carey*, the Supreme Court invalidated a restriction on residential picketing, joined with a narrow exemption for labor picketing: although the restriction undoubtedly still protected privacy in the vast majority of cases, it failed strict scrutiny because "nothing in the content-based labor-nonlabor *distinction* has any bearing whatsoever on privacy." 447 U.S. at 465 (emphasis added). Likewise, in *Perry*, the Ninth Circuit acknowledged that a broad restriction on solicitations on the Venice Beach Boardwalk clearly "would aid" the government in reaching its goals of reducing "unfair competition and [] aiding the free flow of traffic." 121 F.3d at 1370. Nonetheless, the restriction failed intermediate scrutiny because it contained a narrow exemption for nonprofit speakers, and there was "no evidence that those without nonprofit status are any more cumbersome upon fair competition or free traffic flow than those with nonprofit status." *Id.* So too here, as there is no privacy-related distinction justifying the differential treatment of autodialed calls seeking to collect government-backed debts and those seeking to collect other debts (or to achieve unrelated commercial or noncommercial purposes). As was the case in *Reed*, the government "cannot claim that placing strict limits on [some calls] is necessary to [promote privacy] while at the same time allowing unlimited numbers of other types of [calls] that create the same problem." 135 S. Ct. at 2231.[18]

---

[18] The Government claims (at 20) that the exemption of government-backed debt collection calls is "cabined" because the FCC has adopted rules that presume consent to place such calls, but limit callers to three calls each month. However, those rules are not in effect because they have not been approved by the Office of Management and Budget, and may not obtain such approval. FCC 2016 Order, 31

1    Nor is Spectrum aware of any case in which the Ninth Circuit has ever
2    upheld a content-based provision that, like this one, privileges and promotes
3    private, "commercial"[19] speech over and above all political speech.  In fact, the
4    Ninth Circuit has held that such a preference for commercial speech is *per se*
5    unconstitutional.   *Berger*, 569 F.3d a 1055 ("[T]he rule's preference for
6    concessionaires … [means] that purely commercial speech, which receives more
7    limited First Amendment protection than noncommercial speech, is allowed and
8    encouraged, while artistic and political speech is not. This bias in favor of
9    commercial speech is, on its own, cause for the rule's invalidation."); *National*
10   *Advertising*, 861 F.2d at 248 ("[A] [restriction] is invalid if it imposes greater
11   restrictions on noncommercial than on commercial [speech] or regulates
12   noncommercial [speech] based on … content."); *Desert Outdoor Advertising*, 103
13   F.3d at 819 (same).   This is far from a theoretical concern:   Section
14   227(b)(1)(A)(iii) is now routinely used as a bludgeon against political speech, even
15   as private debt collectors of government-backed debts are free from any liability.
16   *Compare Shamblin v. Obama for Am*., No. 8:13-CV-2428-T-33TBM, 2015 WL
17   1754628, at *2 (M.D. Fla. Apr. 17, 2015) (denying summary judgment for
18   defendants Democratic National Committee and Obama for America on claims
19   under Section 227(b)(1)(A)(iii)) *and* Complaint, *Thorne v. Donald J. Trump For*
20   *President, Inc*., Case No. 1:16-cv-04603 (N.D. Ill. Apr. 25, 2016), ECF No. 1
21   (bringing similar claims against the Donald Trump's presidential campaign) *with*
22
23   FCC Rcd. at 9098-99, ¶¶ 59-60; Markey-Lee Letter at 1. Thus, government-backed
24   debt collection calls remain totally free of limitation.  But in any event, such rules
     would only limit, rather than eliminate, the harm of this content-based provision,
25   by merely *favoring* government-backed debt collection messages, without totally
26   exempting them.
27   [19] The Government takes the position that debt collection calls are "commercial"
     speech.  *See* United States' Memorandum of Law, *Mejia*, No. 8:15-cv-6445-JPO,
28   at 11-12 (S.D.N.Y. March 3, 2017), ECF No. 147.

DEFENDANTS' CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE
PLEADINGS

*Hassert v. Navient Solutions, Inc.*, 232 F. Supp. 3d 1049, 1052 (W.D. Wis. 2017) (dismissing claim against private debt collector of private student loan, based on government-backed debt collection exemption).[20]

> 2. *The government and Plaintiff fail to advance any evidence that discredits Spectrum's "obvious" less restrictive alternatives.*

Plaintiff and the government do not even attempt to meet their burden to submit "tangible evidence" showing that Section 227(b)(1)(A)(iii) is the least restrictive alternative capable of accomplishing its goals. *Edwards v. City of Coeur D'Alene*, 262 F.3d 856, 863 (9th Cir. 2001). Indeed, "[a] sampling of [regulations] employed" by the government in like circumstances "demonstrates that less restrictive alternatives … are readily available." *Id.* at 866. "[T]he availability of obvious less-restrictive alternatives renders a speech restriction overinclusive" and unconstitutional. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 826 (9th Cir. 2013).

With respect to the "obvious" alternative of adopting either nationwide or caller-specific "do-not-call" lists of persons who do not wish to receive autodialed calls—a measure the FCC *has already adopted* to restrict the dialing of live telemarketing calls (47 C.F.R. §§ 64.1200(c)-(d))—the government claims (at 20), without citing any evidence, that such lists would not be "as effective" as a total restriction on such calls. But in other contexts, do-not-call lists have been widely accepted as effective, including by the government. For example, the FCC previously found that "the company-specific do-not-call list alternative is the most effective and efficient means to permit telephone subscribers to avoid unwanted telephone solicitations." *Rules and Regulations Implementing The Telephone*

---

[20] Plaintiff claims (at 7) that Spectrum's calls are "commercial." But Spectrum is entitled to raise its challenge to the Section 227(b)(1)(A)(iii)'s application to both commercial and noncommercial messages, including its preference for select commercial speech over other private, noncommercial speech. *See supra* at 11-12.

*Consumer Protection Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd 8752, 8765 (1992).  And the FCC adopted its nationwide do-not-call list rules as "the most effective and efficient manner to protect consumer privacy needs." *Rules and Regulations Implementing The Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, ¶ 40 (2003). The government provides no evidence, as it must, as to why the "[o]bvious, less burdensome means" of do-not-call lists would not sufficiently protect its asserted interests.  *Foti*, 146 F.3d at 642-3.  And it ignores cases such as *Cahaly*, which expressly recognized that do-not-call lists *are* equally effective, less restrictive alternatives to autodialer restrictions. 796 F.3d at 405-6 ("Plausible less restrictive alternatives include time-of-day limitations, mandatory disclosure of the caller's identity, or do-not-call lists.").  Indeed, a do-not-call list would almost certainly be *more effective* than Section 227(b)(1)(A)(iii)'s prohibitions, as it would provide callers with a universal list of individuals who do not wish to receive such calls, and consumers with the ability to opt out of such calls with one stroke; by contrast, Section 227(b)(1)(A)(iii) provides no definitive list of such individuals, and does nothing to prevent accidental autodialing of reassigned mobile phone numbers.

The Ninth Circuit has reiterated time and again that allowing a listener to "opt out" from receiving unwanted speech is an equally effective alternative to broad restrictions intended to protect residential privacy.  In *Klein*, the Ninth Circuit expressly recognized that allowing a listener to "opt out" of unwanted speech—whether by posting "'No Solicitations' signs" on their homes or "opt[ing] out of car leafletting" by posting a sign on their car—is an "obvious" and adequate less restrictive alternative to mandatory restrictions on leafletting.  584 F.3d at 1205.  Likewise, in *Dex Media West, Inc. v. City of Seattle*, the Ninth Circuit held that residents who did not wish to receive the "Yellow Pages" at their homes could join the Yellow Pages' "private opt-out programs," which provided a "clear alternative" to a mandatory government permitting regime intended to protect

1   residential privacy.  696 F.3d 952, 966 (9th Cir. 2012); *see also Berger*, 569 F.3d

2   at 1038 (noting that "homeowner's privacy interests can be adequately protected

3   by 'No Solicitation' signs") (collecting cases).

4          The government also implicitly acknowledges that at least one less-

5   restrictive alternative is available: as the government points out, the FCC has

6   adopted rules for government-backed debt collection calls which, if and when they

7   eventually become effective (*see supra* n.18), will presume prior express consent

8   to place autodialed calls to collect government-backed debts, limit such calls to

9   three calls each month, and permit the debtor to request that such calls end at any

10  time.  ECF No. 38 at 21 (citing FCC 2016 Order, 31 FCC Rcd. at 9088-94).  The

11  government fails to explain (much less present evidence) as to why this "obvious"

12  alternative would not sufficiently protect privacy if applied to *all* autodialed calls.

13  Absent such *evidence* discounting these obvious alternatives, *Playboy Entm't*

14  *Group*, 529 U.S. at 822, the Court should follow the Fourth Circuit in concluding

15  that less restrictive alternatives are available, in place of this content-based

16  restriction, *Cahaly*, 796 F.3d at 405-06.

17                              **CONCLUSION**

18         The Court should strike down Section 227(b)(1)(A)(iii) under strict scrutiny

19  because the content-based discrimination it authorizes cannot be justified.  To be

20  clear: Spectrum is not suggesting that Congress cannot restrict autodialed calls, or

21  even that it must fundamentally alter its regulatory approach.  Indeed, the original,

22  unadorned Section 227(b)(1)(A)(iii), as first enacted in 1991, would likely survive

23  First Amendment scrutiny (provided that its wholesale exemption for all

24  government messages were refined to exempt only messages serving a compelling

25  interest).  That is the teaching of *Moser* and *Campbell-Ewald*.  But in attempting to

26  regulate such calls, the government cannot starkly discriminate against disfavored

27  speakers and messages and impose severe liability on them; the government is not

28  free to pick and choose which speakers and messages it wishes to advance, while

                                        32                    Case No. 5:17-cv-01361-CAS-KK

1    restricting the remainder.   For these reasons and those set forth above, Spectrum
2    respectfully requests that the Court enter judgment in its favor.

3
     DATED:  January 22, 2017          **Respectfully submitted,**
4
                                       **THOMPSON COBURN LLP**
5

6

7                                      By:        /s/ Helen B. Kim
8                                          HELEN B. KIM
                                           GEOFFREY L. WARNER
9
                                       **LATHAM & WATKINS LLP**
10                                     MATTHEW A. BRILL (*pro hac vice*)
11                                     ANDREW D. PRINS (*pro hac vice*)

12                                     Attorneys for Defendant CHARTER
13                                     COMMUNICATIONS, INC. and
                                       SPECTRUM MANAGEMENT
14                                     HOLDING COMPANY, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      33              Case No. 5:17-cv-01361-CAS-KK

## <u>PROOF OF SERVICE</u>

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of Los Angeles, State of California.  My business address is 2029 Century Park East, 19th Floor, Los Angeles, California 90067.

On January 22, 2018, I served true copies of the following document(s) described as **CHARTER COMMUNICATIONS, INC. AND SPECTRUM MANAGEMENT HOLDING COMPANY, LLC'S CONSOLIDATED REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS** on the interested parties in this action as follows:

| | |
|---|---|
| Todd M. Friedman<br>Meghan E. George<br>Adrian R. Bacon<br>LAW OFFICES OF TODD M. FRIEDMAN, P.C.<br>21550 Oxnard Street, Suite 780<br>Woodland Hills, CA 91367<br>Tel:  (877) 206-4741<br>Fax:  (866) 633-0228<br>Email:   tfriedman@toddflaw.com<br>            mgeorge@toddflaw.com<br>            abacon@toddflaw.com | *Attorneys for Plaintiff* |
| Anjali Motgi<br>Trial Attorney, U.S. Department of Justice<br>Civil Division, Federal Programs Branch<br>20 Massachusetts Avenue N.W.<br>Washington, D.C. 20530<br>Tel:  (202) 305-0879<br>Fax: (202) 616-8470<br>Email:   anjali.motgi@usdoj.gov | *Attorneys for Intervenor*<br>*UNITED STATES OF*<br>*AMERICA* |

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 22, 2018, at Los Angeles, California.

/s/ Catherine C. Mamayson
Catherine C. Mamayson

Case No. 5:17-cv-01361-CAS-KK